UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DANIEL AGER, individually and as a Successor in Interest to the ESTATE OF ALAN AGER, KATHRYN AGER and ELIZABETH AGER,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHONY HEDGEPATH, et al.,<br><br>Defendants. | Case No.: 5:11-CV-06642-EJD<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT**<br><br>**[Re: Docket Nos. 102, 110]** |

Presently before the court in this § 1983 action are Plaintiffs Daniel Ager, Elizabeth Ager, and Kathryn Ager's (collectively, "Plaintiffs") Motion for Partial Summary Judgment (Dkt. No. 102) and Defendants Anthony Hedgepath, Belinda Hendrick, and Robert Burgh's (collectively, "Defendants") Motion for Summary Judgment. The court heard argument on these motions on December 13, 2013. Having fully reviewed the parties' briefing, and for the foregoing reasons, the court GRANTS Defendants' Motion and DENIES Plaintiffs' Motion as moot.

1
Case No.: 5:11-CV-06642-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT

## I. BACKGROUND

### a. Factual Background

This case concerns the untimely death of Dr. Alan Ager, an inmate at Salinas Valley State Prison ("SVSP"), as a result of an assault by his cellmate on April 6, 2010. Dr. Ager was convicted of continuous sexual abuse of a minor and subsequently incarcerated in California State Prison, first at San Quentin State Prison, and then at SVSP. See Third Amended Complaint ("TAC") ¶¶ 9-10, 12, Dkt. No. 98. At all relevant times, Defendant Hedgepath worked as the Warden of SVSP, Defendant Hedrick worked as the Associate Warden, and Defendant Burgh worked as a Correctional Counselor II. Decl. of Anthony Hedgepath ISO Def. MSJ ¶ 1, Dkt. No. 112; Decl. of B. Hedrick ISO Def. MSJ ¶ 1, Dkt. No. 113; Decl. of Robert Burgh ISO Def. MSJ ¶ 1, Dkt. No. 111.

While at San Quentin, Dr. Ager requested and was granted Sensitive Needs Yard ("SNY") housing. Dkt. No. 111 ¶ 3. The SNY designation is reserved for inmates who require protective custody due to special case factors such as type of conviction, sexual orientation, or gang dropout status. See id. Upon Dr. Ager's transfer to SVSP in September 2008, the Unit Classification Committee ("UCC") evaluated Dr. Ager's SNY designation and concluded Dr. Ager continued to warrant SNY housing and could be double celled with other SNY inmates. Decl. of Sahar Nayeri ISO Def. MSJ Exs. F, G, Dkt. No. 115. On February 28, 2009, Dr. Ager appeared before a UCC for his annual review and stated that he believed prison officials had revealed the nature of his crime to other inmates. Decl. of John Houston Scott ISO Pl. Opp'n Ex. C at 1963, Dkt. No. 120. The committee took note of Dr. Ager's statement and concluded, inter alia, that no changes should be made to his housing. Id.

Six months after his transfer to SVSP, on March 11, 2009, prison officials discovered multiple packages of controlled medication in Dr. Ager's cell. Dkt. No. 115 Ex. I. Dr. Ager indicated to the officials that he bought the pills so that he could commit suicide. Id. As a result of this violation, Dr. Ager was moved from SNY to the Administrative Segregation Unit ("ASU"). Dkt. No. 115 Ex. H. An Institutional Classification Committee ("ICC") convened on March 19,

2009 to evaluate Dr. Ager's placement in ASU. At the meeting, Dr. Ager expressed concerns of remaining in ASU and potentially being single-celled; he also requested that he continue to be double-celled. The committee elected to retain Dr. Ager in ASU for 90 days to complete the disciplinary process for his violation. Dkt. No. 120 Ex. C at 1961.

On May 7, 2009, Dr. Ager voluntarily waived his SNY status in order to participate in the Enhanced Outpatient Program ("EOP"), which is a program for inmates suffering from mental illness who require intensive mental health treatment. Dkt. No. 115 Ex. AC; Dkt. No. 111 ¶ 5. As a result, he went from being classified as a Level III-SNY inmate to a Level IV-EOP inmate. Shortly thereafter, on May 14, 2009, Dr. Ager appeared before the ASU ICC for a program review. Dkt. No. 120 Ex. C at 1959. Upon a hearing on Dr. Ager's Rules Violation Report ("RVR") for distribution of controlled medication, Dr. Ager was found guilty of a lesser included offense of possession of a controlled substance. Id. Considering this lesser offense and Dr. Ager's waiver, the committee determined that Dr. Ager should be released from ASU to a Level IV-EOP yard and informed Dr. Ager that he could be referred back to SNY placement once his mental health status was downgraded to Correctional Clinical Case Management System ("CCCMS"), a status assigned to inmates with mental health issues who do not need the intensive treatment provided by EOP and can program on yards housing inmates without mental health needs. Id.; see Dkt. No. 115 Ex. AC; Dkt. No. 111 ¶¶ 5, 7.

On July 28, 2009, Dr. Ager notified prison officials that he wished to rescind his EOP status and return to SNY and brought a grievance on that issue. Dkt. 115 Ex. O. Because SVSP did not have an EOP/SNY yard, officials moved Dr. Ager from EOP to ASU housing pending ICC review of his status. Id. The following day, Dr. Ager met with Lieutenant Warfield, who worked as Facility Captain of ASU, and indicated that he had no enemy concerns and wished to return to EOP. Id. Several days later, on August 4, 2009, Dr. Ager participated in a UCC meeting reviewing his housing. Id. Ex. P. The committee decided to transfer Dr. Ager back to the EOP yard from ASU, and Dr. Ager agreed with the decision. Id. However, Dr. Ager continued to disagree with his EOP placement. Several weeks later, on September 15, 2009, Dr. Ager appeared

3

before an ICC for a Vitek hearing because he had been referred for Department of Mental Health ("DMH") placement but refused to voluntarily be housed in DMH, arguing that he "did not belong in the EOP program at all." Dkt. No. 120 Ex. C at 1956. The Committee approved his DHM placement and ordered that he continue in his EOP placement pending transfer. Id.

On November 12, 2009 Dr. Ager's clinician lowered his level of mental care from EOP to CCCMS, rendering Dr. Ager eligible to return to a Level III SNY housing unit. See Dkt. 111 ¶ 7. Because SVSP did not have an SNY/CCCMS unit, the UCC that convened on December 1, 2009 to review Dr. Ager's housing status determined that Dr. Ager should be transferred to either Mule Creek State Prison or Sierra Conservation Center. Dkt. No. 111 Ex. 3. The committee also determined that, because Dr. Ager had not expressed any safety concerns and had already successfully programmed on the EOP yard for six months, Dr. Ager should remain on the EOP yard pending transfer. Id. Dr. Ager agreed with the committee's decision. Id. The UCC's recommendation for transfer was subsequently endorsed by the Classification Services Representative, and Dr. Ager's name was added to the transfer waiting list. Dkt. No. 111 ¶ 8. At the time, the average wait for a transfer was between six to nine months. Id.

Following the UCC meeting, but before reaching his cell, Dr. Ager was assaulted by an inmate named Aragon in the presence of prison officials. Dkt. No. 115 Ex. R. Prison officials immediately placed Aragon in a holding cell, issued an RVR to him, and added him to Dr. Ager's list of enemies to ensure the two would not come into contact again. See Dkt. No. 115 Exs. N, R, S, T. The next day, Dr. Ager was celled with inmate Gadson. Dkt. No. 115 Ex. U. Less than ten days later, on December 11, 2009, Dr. Ager was assaulted by inmate Gadson in his cell in the presence of correctional officers. Dkt. No. 115 Ex. V. The officials immediately separated the inmates and subsequently placed each of them in ASU. Id. Additionally, the officials issued an RVR to Gadson, referred the incident to the district attorney for prosecution, and added Gadson to Dr. Ager's list of enemies. Dkt. No. 115 Exs. N, V. Defendant Burgh conducted an in-cell assault review and found that the inmates had been properly housed together and that Dr. Ager did not need to be placed in protective custody after the assault. Dkt. No. 115 Ex. AB.

4
Case No.: 5:11-CV-06642-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT

On December 22, 2009, another UCC, chaired by Defendant Burgh, convened to review Dr. Ager's housing; Dr. Ager declined to attend this meeting. Dkt. No. 111 Ex. 4. The committee determined that, despite the recent in-cell assault, Dr. Ager did not present with victimization issues that would warrant single celling and accordingly that he should continue to be double-celled in the EOP unit. Id. Several weeks later, on January 12, 2010, another UCC chaired by Defendant Burgh convened to conduct an annual review of Dr. Ager's housing. Dkt. No. 111 Ex. 5. Dr. Ager again declined to appear before the committee but was assigned a staff assistant to be present during the meeting. Id. The committee decided to maintain Dr. Ager's housing program without any modifications. Id. Two days later, on January 14, 2010, Dr. Ager appeared before an ICC chaired by Defendant Hedrick that convened to determine whether Dr. Ager was eligible for living in a dormitory setting under a recently implemented pilot program. Dkt. No. 113 Ex. B. The committee determined that Dr. Ager qualified for the program, Dr. Ager agreed, and the committee referred the case to the CSR for further action. Id. Despite having been reduced to CCCMS status and having been referred to this pilot program, Dr. Ager continued to be housed in the EOP unit rather than being transferred to the Transitional Program Unit ("TPU").

On January 27, 2010, an inmate named Beaver became Dr. Ager's cellmate in EOP. Correctional officers regularly monitored Dr. Ager and inmate Beaver's cell and observed the two getting along well. Decl. of J. Lopez ISO Def. MSJ ¶ 4, Dkt. No. 114. During his incarceration, Dr. Ager periodically used the prison's inmate grievance system but never submitted a grievance about any safety concerns regarding inmate Beaver. See, e.g., Dkt. No. 114 ¶ 8; Dkt. No. 115 Exs. AD-AF. Yet, on April 6, 2010, inmate Beaver assaulted Dr. Ager, which ultimately resulted in Dr. Ager's death ten days later. See Dkt. No. 114 ¶ 8.

### b. Relevant Prison Policies

The following Operation Procedures were in place at SVSP at all relevant times:

#### i. SVSP Operation Procedure 42 – Inmate Housing

42.3.4 – Double Celling: Unless approved for single cell assignment, inmates are expected to share occupancy of living quarters, either in a dormitory setting or within an individual cell. The process for assigning more than one inmate to the same cell shall be initiated by staff recommendation or per request by the inmate candidates. …

5
Case No.: 5:11-CV-06642-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT

> 42.3.4 – SNY/EOP:  When the [ICC] refers an inmate for [SNY] Placement, the inmate must not be re-housed with a non-SNY inmate.  Similarly, transitions between levels of care will impact cell-partner compatibility (EOP to CCCMS must house with non-EOP inmates).  CCCMS inmates may continue to be celled with inmates not included in the Mental Health Delivery System.
>
> SNY inmates may be celled with SNY inmates only.  …
>
> SNY-EOP inmates may be celled with SNY-EOP only.
>
> EOP may be celled with EOP only.

Decl. of John Houston Scott ISO Pl. Mtn. Partial Summ. J. Ex. A, Dkt. No. 102.

### ii. SVSP Operation Procedure 11A – Transitional Program Unit

> The TPU will be established as a General Population housing unit for inmates that need assistance to transition from the [ASU], but cannot be placed into SVSP's General Population, who have already been endorsed to a Departmentally approved [SNY] or have been referred to the [CSR] Classification & Paroles Representative (C&PR) for SNY placement.  [ICC] has the responsibility and authority to review and approve/deny cases for TPU placement.
>
> <u>Policy</u>  It is the primary objective of the Department of Corrections to protect the public by safely keeping the persons committed to the custody of the Director of Corrections, and to afford such persons every reasonable opportunity and encouragement to participate in rehabilitative activities.  Consistent effort will be made to ensure the security of the institution and the effectiveness of the programs within the framework of security and safety.  The implementation of this Transitional Program Unit is designed to provide Salinas Valley State Prison with effective maintenance of the inmate's needs related to their personal safety and institutional security.
>
> <u>Objective</u>  The objective of this procedure is to provide secure housing separate from the General Population for inmates who, for various reasons, cannot be housed in the mainline General Population setting without endangering their safety and institutional security.  Such housing is generally denied as Administrative Segregation.  However, the TPU provides a less restrictive and more economical housing alternative for those inmates who are unable to safely program within SVSP's mainline General Population, but whose circumstances do not warrant traditional Administrative Segregation housing.  Although some limitations are placed on the inmates housed within the TPU, participation is voluntary.  The TPU is considered temporary housing of the affected inmates.
>
> …
>
> <u>Eligibility for TPU</u>   Administrative Segregation Unit Inmates endorsed for transfer to a departmentally approved General Population SNY Institution or who have been referred to the [CSR] for [GP] SNY placement will be reviewed by ICC for placement consideration within TPU pending transfer.
>
> Enhanced Outpatient Program Inmates reduced from EOP level of care to CCCMS level of care that have been unresolved safety issues that prevent them from being returned to the SVSP General Population will be placed into ASU until the safety issues are resolved and they are endorsed to a departmentally approved General Population SNY Institution, or

6
Case No.: 5:11-CV-06642-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT

> have been referred to the CSR for General Population SNY placement will be referred to ICC for placement consideration within TPU pending transfer.
>
> [EOP] Inmates reduced from EOP level of care to CCCMS level of care that have been referred to the CSR for [GP] SNY placement, or endorsed for [GP] SNY placement will be referred to ICC for placement consideration in TPU pending transfer.
>
> …
>
> <u>Initial TPU Placement</u>   ICC must approve all inmate participants for placement in the TPU. ICC Staff should present this program as an option to those inmates that meet the aforementioned criteria.
>
> …

Dkt. No. 102 Ex. B.

## II. Legal Standard

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything and summary judgment must be denied. <u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1102–03 (9th Cir. 2000). On the other hand, if the moving party does meet this initial burden, the burden then shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); <u>Celotex</u>, 477 U.S. at 324. The court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324. However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. See <u>Thornhill Publ'g Co. v. GTE Corp.</u>, 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c); see also <u>Hal Roach Studios, Inc. v. Feiner & Co., Inc.</u>, 896 F.2d 1542, 1550 (9th Cir. 1990).

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). However, where the nonmoving party will have the burden of proof at trial on a particular issue, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Provided adequate time for discovery has been provided, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

### III.   Discussion

In their Motion for Summary Judgment, Defendants argue that Plaintiffs have failed to substantiate their deliberate indifference claim. Under the Eighth Amendment, a prison official can be held liable for an injury suffered by one prisoner at the hands of another when "he knows that [an] inmate[] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994). To succeed on their claim for deliberate indifference under the Eighth Amendment, Plaintiffs must show that (1) Dr. Ager objectively faced a substantial risk of harm; (2) Defendants, subjectively, were aware of facts from which they could draw the inference of a substantial risk of serious harm to Dr. Ager; (3) Defendants actually drew that inference; and (4) Defendants were deliberately indifferent to Dr. Ager's safety in the face of that risk. Id. at 834, 837; Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049-1050 (9th Cir. 2002). Neither negligence nor gross negligence constitutes deliberate indifference. Farmer, 511 U.S. at 835-37.

Both parties agree that the court must consider all the relevant facts that were available to Defendants in determining whether Defendants could have drawn an inference of a substantial risk of serious harm to Dr. Ager. According to Defendants, Dr. Ager had been housed in EOP for six months without incident, his housing status had been considered multiple times by ICCs and

8
Case No.: 5:11-CV-06642-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT

UCCs, and Dr. Ager had never raised any safety issues. Though Dr. Ager regularly availed himself of the prison grievance system, he never filed a complaint about his safety or about inmate Beaver. As to the two assaults, Defendants urge the court to consider the nature of the attacks and the way they were handled. Specifically, Defendants point out that the December 1, 2009 attack by inmate Aragon did not occur in Dr. Ager's cell, but rather in a different building near the medical clinic. As to both the December 1, 2009 and the December 11, 2009 assaults, Defendants stress that the officers immediately separated the inmates, issued RVRs to Dr. Ager's attackers, added those inmates to Dr. Ager's enemies list, and issued reports on the incidents. Under these circumstances, Defendants contend that none of them were aware of any facts suggesting that Dr. Ager faced a continuing substantial risk of serious harm. Even assuming that Dr. Ager's housing was inconsistent with internal prison policy after his status was reduced to CCCMS, Defendants argue that, in light of the above facts, the violation alone does not establish deliberate indifference to Dr. Ager's safety.

At the hearing, Plaintiffs presented a drastically different narrative from that of Defendants. Plaintiffs first explained that while assaults in prison are common, they tend to occur in the areas of the facility where prisoners are somewhat in control, i.e. where officials would not be able to pinpoint the perpetrator of an attack. By contrast, in-cell assaults and assaults in front of prison officials are rare, in part because the perpetrator in those scenarios is easily identifiable. Plaintiffs contend that, considering this reality, the facts that a prisoner who had been designated SNY, who had expressed concerns about officials' revealing the nature of his offense to other inmates, who had been found hoarding substances for the purpose of committing suicide, and who had been threatened and assaulted multiple times in the presence of prison officials presented more than a substantial basis from which a reasonable prison official should have drawn the inference that Dr. Ager faced a substantial risk of serious harm. Moreover, Plaintiffs point out, Defendants were in violation of their own policies by continuing to house Dr. Ager with EOP inmates instead of transferring him to TPU or SNY once his mental status was reduced to CCCMS, a fact which should have further alerted them to the risk of serious harm to Dr. Ager. Given this weighty

background, Plaintiffs argue, Defendants were deliberately indifferent to the substantial risk of serious harm in housing Dr. Ager on the Level IV-EOP yard after his mental status was reduced to CCCMS and in celling him with inmate Beaver, who was doing life without parole and had stated to his ICC that he would kill his next cellmate if he did not like him.

Though Plaintiffs' narrative is compelling, they ask the court to draw a number of inferences in their favor without supplying competent evidence to support such inferences. For instance, Plaintiffs submit no deposition testimony or other evidence to support any of their background explanations on the reality of prison life that Defendants would have been aware of, other than Defendant Burgh's statement that "in-cell attacks are rare." Also lacking is evidence supporting Plaintiffs' assertion that "[i]t is extremely rare, if not unheard of, that a level III CCCMS/SNY inmate would be housed on a level IV EOP/GP unit," as well as evidence establishing inmate Gadson's and inmate Aragon's classifications that would be required to show that Defendants were in violation of the internal operation procedures. Dkt. No. 134 at 2. Nor do they supply evidence of inmate Beaver's sentence, prior violence, or disturbing statements to the ICC. Even viewing the evidence in the light most favorable to Plaintiffs and assuming that Plaintiffs had established that Defendants were in violation of their own internal policy, such a showing, without more, does not go so far as to establish that Dr. Ager faced an objective <u>substantial</u> risk of <u>serious</u> harm in the EOP unit or with inmate Beaver, that each Defendant knew he faced any such risk, or that each Defendant was deliberately indifferent to the risk. Without evidence to support the assumptions they ask this court to make, Plaintiffs simply have not met their burden of showing a triable issue of material fact on their deliberate indifference claim. <u>See</u> Celotex, 477 U.S. at 322-32 (holding that summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"); <u>Thornhill Publ'g Co.</u>, 594 F.2d at 738 (finding conclusory and speculative statements, unsupported by evidence, to be insufficient to avoid summary judgment). As a result, Plaintiffs have also failed to demonstrate a triable issue of material fact as to their familial association claim, because such a claim is

10
Case No.: 5:11-CV-06642-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT

derivative from Dr. Ager's own claim for deliberate indifference. See <u>Johnson v. City of Oakland</u>, No. 97-cv-238-JSB, 1997 WL 776368, at * 4 (N.D. Cal. Dec. 3, 1997).

### IV.  Order

For the foregoing reasons, the court GRANTS Defendants' Motion for Summary Judgment. Plaintiffs' Motion for Partial Summary Judgment is thus DENIED as moot.

Judgment will be entered in favor of Defendants. The clerk shall CLOSE this file.

**IT IS SO ORDERED.**

Dated: March 26, 2014

                                             EDWARD J. DAVILA
                                             United States District Judge

Case No.: 5:11-CV-06642-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT